STUDENT PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC. and Friends of the Earth, Plaintiffs,

v.

GEORGIA–PACIFIC CORPORATION, Defendant.

Civ. A. No. 84–1063.

United States District Court, D. New Jersey.

Aug. 19, 1985.

Edward L. Lloyd, Trenton, N.J. and Bruce J. Terris, James M. Hecker, Carolyn A. Smith, Terris & Sunderland, Washington, D.C., for plaintiffs.

Bruce S. Haines, Cohen, Shapiro, Polisher, Shiekman & Cohen, Cherry Hill, N.J., and Hershel J. Richman, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for defendant.

BROTMAN, District Judge.

This matter concerns defendant Georgia-Pacific Corporation's alleged violations of a United States Environmental Protection Agency ("EPA") water pollution discharge permit. Plaintiffs Student Public Interest Research Group of New Jersey, Inc. ("SPIRG") and Friends of the Earth ("FOE") bring this action under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "Act"). The complaint charges defendant with emitting unlawfully high levels of pollutants into the Delaware River from a wastepaper recycling and chipboard production plant in Delair, New Jersey. Pursuant to Section 505 of the Act, 33 U.S.C. § 1365, the "citizen suit" provision, plaintiffs seek a declaration that defendant committed some 162 violations of their EPA discharge permit between January 1, 1979 and December 31, 1983. Plaintiffs also ask the court to impose civil penalties and various forms of injunctive relief.

Presently before the court are a series of dispositive motions. Defendant requests summary judgment, pursuant to Fed.R. Civ.P. 56, on the grounds that plaintiffs lack standing to sue. Georgia-Pacific also moves to dismiss the complaint for lack of subject matter jurisdiction and failure to state a cause of action. Fed.R.Civ.P. 12(b)(1), (6). Plaintiffs ask for partial sum-mary judgment restricted to the issue of liability. For reasons set forth below, the court will deny defendant's motions to dismiss and for summary judgment, and will grant in part plaintiffs' motion for partial summary judgment.

**Factual Background and Procedural History**

An EPA discharge permit (also known as a "national pollution discharge elimination system" permit, or "NPDES") went into effect at defendant's Delair plant on July 31, 1974. In April, 1982, EPA delegated to the states the authority to issue water pollution discharge permits pursuant to Section 402(b) of the Clean Water Act. 33 U.S.C. § 1342(b). Nevertheless, the EPA permit, NPDES Permit No. NJ0004669, remained in force until February 1, 1984, when a New Jersey Department of Environmental Protection ("DEP") discharge permit went into effect.[1]

EPA initiated a permit enforcement action against Georgia-Pacific on May 17, 1979. *United States v. Georgia-Pacific Corporation,* Civ. No. 79–1550 (D.N.J.). On May 12, 1981, defendant and EPA entered into a Consent Judgment whereby Georgia-Pacific agreed to pay $75,000.00 in fines to the United States and to install a "clarifier" in order to reduce effluents into the Delaware River.

A major contested issue in this case is the scope of the Consent Judgment. The document purports to cover "all claims asserted" by the United States. Plaintiffs maintain the decree covers only violations specified in the original complaint: violations between February, 1977 and December, 1978. Defendants contend the order covers all violations up to May 12, 1981, the day the order was signed.

On March 4, 1983, plaintiffs directed a letter to Georgia-Pacific informing the company that they intended to initiate a citizen

---

1. The EPA permit expired on July 31, 1979 but remained in effect by operation of law. 40 C.F.R. § 122.6; N.J.A.C. 7:14A–2.3. The DEP permit, NJPDES Permit No. 0004669, issued on December 16, 1983. Until the state permit's effective date, February 1, 1984, the EPA permit continued to apply. 40 C.F.R. § 122.6(a); N.J. A.C. 7:14A–2.3(a). Like the NPDES permit, the state permit set effluent limits with respect to acidity, "total suspended solids," biological oxygen demand, zinc, lead and temperature. Defendant's Brief in Support of Motion to Dismiss, Exhibits B, D.

suit. The notification cited 398 specific instances in which defendant's discharges exceeded its NPDES permit limits between July, 1977 and May, 1982. Complaint, Appendix A. At the same time, plaintiffs also sent similar notice letters to EPA and DEP. Plaintiffs derived their list of purported violations by comparing defendant's permit limits with data contained in monthly Discharge Monitoring Reports ("DMRs") and Non-Compliance Reports ("NCRs") submitted to the EPA by defendant in accordance with its permit.

During the twelve months after issuance of plaintiffs' notice letters, the parties exchanged information and conducted settlement negotiations. In spite of such efforts, the parties were unable to reach an amicable resolution of this matter. Consequently, plaintiffs filed this action on March 19, 1984.

Since the entry of the Consent Judgment between defendant and the United States on May 12, 1981, both EPA and DEP have monitored the discharge of pollutants at defendant's Delair plant. At various times between May 12, 1981 and March 19, 1984, EPA has issued reports concerning defendant's compliance with its NPDES permit. In addition, Georgia-Pacific officials have met and corresponded with federal and state environmental regulators on various occasions during this period. Between December, 1981 and the fall of 1983, DEP monitored defendant's Delair operations and had numerous contacts with defendant's legal staff regarding development of a state water pollution discharge permit. Defendant's Reply Brief in Support of Motion to Dismiss, Exhibits B, D, G.

Subsequent to the filing of this lawsuit, plaintiffs conducted a review of defendant's monthly DMRs through January, 1984. Plaintiffs' Brief in Opposition to Motion to Dismiss, Exhibit D. Based on this research, plaintiffs now allege defendant violated the Clean Water Act, by exceeding effluent levels in its NPDES permit, 162 times between January 1, 1979 and December 31, 1983. Plaintiffs' Brief in Support of Partial Summary Judgment, Appendix II, Exhibit D.

**Defendant's Motions**

Defendant Georgia-Pacific originally moved to dismiss the complaint on two grounds: plaintiffs' lack of standing to sue and plaintiffs' failure to state a cause of action under the citizen suit provision of the Clean Water Act. 33 U.S.C. § 1365. In addition, defendant charges that certain aspects of the relief plaintiffs request is not available in a citizen suit. Subsequently, both parties submitted affidavits relevant to the issue of standing. In accordance with Fed.R.Civ.P. 12(b)(6), defendant now contests plaintiffs' standing in the form of a motion for summary judgment, pursuant to Fed.R.Civ.P. 56. As plaintiffs' standing to sue is a question which concerns the power of the court to hear this matter, the court will address this aspect of defendant's motions first.

**1. Standing**

The standard for granting summary judgment is a stringent one. Rule 56(c), Fed.R.Civ.P., provides that summary judgment may be granted only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Special Jet Services, Inc. v. Federal Insurance Co.*, 643 F.2d 977 (3rd Cir.1981); *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62 (3rd Cir.1978). In deciding whether an issue of material fact does exist, the court is obligated to view all doubt in favor of the nonmoving party. *Tomalewski v. State Farm Insurance Co.*, 494 F.2d 882 (3rd Cir.1974); *Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (3rd Cir.1972).

■ Article III of the United States Constitution imposes certain minimum requirements on parties who seek to invoke the judicial power. In order to establish the existence of a bona fide "case or controversy," and thus, a basis for subject matter jurisdiction, a plaintiff must have suffered an "injury-in-fact" causally related to a defendant's actions. In other words, a plaintiff must have "personally ... suffered some actual or threatened injury as a re-

sult of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The Supreme Court has also recognized further limits of a prudential nature, which courts may apply in order to "avoid deciding questions of broad social import where no individual rights would be vindicated." *Id.* at 99–100, 99 S.Ct. at 1607–08. Although Congress may not tamper with the constitutional minima, the legislature may grant a right to sue to those otherwise barred by prudential restrictions. *Id.* at 99–100, 99 S.Ct. at 1607–08.

■ Plaintiffs base this lawsuit on Section 505 of the Clean Water Act, which provides, in pertinent part, that "any citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in violation of ... an effluent standard." 33 U.S.C. § 1365(a)(1)(A). A "citizen" is defined to be "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The legislative history of the statute demonstrates that Congress intended the citizen suit provision to create standing in a manner consistent with the Supreme Court's ruling in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 16–17, 101 S.Ct. 2615, 2624–25, 69 L.Ed.2d 435 (1981). The major principle established by *Sierra Club v. Morton* was that standing may be based on an injury to noneconomic interests, such as aesthetic, conservational or recreational values. 405 U.S. at 738, 92 S.Ct. at 1367. A public interest group, that is, an organization of persons with shared interests, such as the plaintiffs in this case, may sue on the basis of noneconomic injury provided it or any of its members has been injured. *Id.* 734–35, 92 S.Ct. at 1365–66.

■ Defendant initially challenged plaintiffs' standing to sue on the grounds that they had failed to "plead facts demonstrating that particular members of the organization are adversely affected in some specific way." Defendant's Brief in Support of Motion to Dismiss at 14. This position is no longer tenable in light of plaintiffs' submission of nine affidavits from members of SPIRG and FOE who live in the region adjacent to the Delaware River downstream from defendant's Delair facility. These individuals describe various actual and potential detrimental impacts on their aesthetic, recreational, conservational, economic and health interests due to pollution of the Delaware River.

While Georgia-Pacific concedes that plaintiffs have satisfied the injury-in-fact requirement, the company claims that plaintiffs have failed to show that the alleged injuries to its members are causally related to discharges from defendant's plant. Defendant focuses on the Supreme Court's admonition that a plaintiff must show that an alleged injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

In support of its motion for summary judgment, Georgia-Pacific offers the testimony of an environmental engineer. Affidavit of Dr. Robert Dresnack, Defendant's Brief in Support of Summary Judgment, Exhibit C. Dr. Dresnack states that his research indicates that the contribution of defendant's Delair plant to the pollution of the Delaware is "so small that it is not discernible; and therefore, does not and cannot change the nature of the water uses within those respective areas." *Id.* at 3–4, 5–6. Defendant notes that plaintiffs do not allege, either in their complaint, in the affidavits of their members, or in the answer to defendant's interrogatories, that Georgia-Pacific caused the pollution that has harmed plaintiffs' interests in use and enjoyment of the Delaware. Defendant's Brief in Support of Summary Judgment at 8–10. Defendant also would have plaintiffs prove that elimination of Georgia-Pacific's illegal discharges "would permit them to enjoy the recreational activities" which they claim are ruined or prevented by pollution of the Delaware. *Id.* Defendant claims plaintiffs have failed to rebut these

factual contentions, and therefore, that it is entitled to judgment as a matter of law.

The theory advanced by defendant has little if anything to do with the constitutional requirement of causation and thus, is meritless. Georgia-Pacific uses language concerning causation in order to veil an attempt to impose a quantitative test for proof of an injury-in-fact. Defendant acknowledges that its Delair plant emits effluents in excess of the levels specified in its discharge permit and concedes that plaintiffs are injured by pollution of the Delaware. Nevertheless, Georgia-Pacific contends that its contribution to the soiling of the Delaware is so small that plaintiffs are not injured thereby.

The issue of fact defendant purports to raise has already been resolved by Congress. The Clean Water Act presumes unlawful discharges to reduce water quality because definite proof of the proposition is often nearly impossible. Under previous legislation,

which had relied on water quality standards as the primary method of pollution control, [enforcement] had been largely unsuccessful. It was too difficult to establish the necessary correlation between effluent discharges by particular sources and the quality of the body of water into which the effluent flowed. To solve the dilemma, the Act, while retaining water quality standards, predicated pollution control on the application of control technology on the plants themselves rather than on the measurement of water quality.

*Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620, 623 (2d Cir.1976) (footnote omitted). *Accord SPIRGNJ v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1397 (D.N.J.1985).

Defendant asks the court to find that the company's effluents do not cause actual harm even though the court may later determine that such effluents violate defendant's permit, and so, the Clean Water Act. Consequently, defendant would have the court apply a stricter test for standing than for liability itself. Such a result is in conflict with the intent of the Clean Water Act. As the court noted in *SPIRGNJ v. Tenneco Polymers, Inc., supra,*

obviously the pollution of a portion of a major interstate waterway as the Delaware River, is caused by a combination of discharges from many different sources. The effect of defendant's argument would prohibit any citizens' suit against violators of the [Act] unless the violation was so great or the waterway so small that the direct impact of the discharges could be pinpointed. This interpretation of the [Act] would be directly contrary to its intent.

602 F.Supp. at 1397. *Accord Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 444–46 (D.Md. 1985).

■ Defendant's view of standing is also inconsistent with Article III of the Constitution, as interpreted in *Sierra Club v. Morton, supra.* The Constitution requires only that the relief sought may redress an injury allegedly caused by defendant, not that the relief sought may correct all related harm jointly caused by a series of actors. Plaintiffs need not show that this lawsuit will restore the Delaware to a pristine state, only that defendant's role in polluting the river may be lessened thereby. For purposes of establishing standing to sue, the size of an injury is not a valid criterion for determining whether an injury has occurred at all. In *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Court rejected an invitation to limit standing to those "significantly" affected by an alleged wrong. Instead, the Court held that plaintiffs may sue so long as they can demonstrate an "identifiable trifle" constituting actual or threatened injury, because such harm is sufficient to guarantee that plaintiffs have a concrete interest in the outcome of the litigation. 412 U.S. at 689, n. 14, 93 S.Ct. at 2417, n. 14. *See Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Congress has identified NPDES violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of water into which a permittee's effluents flow.

The testimony of Dr. Dresnack does not undermine plaintiffs' claims of injury due to defendant's alleged misconduct. Thus, defendant has failed to rebut the factual basis for standing to sue advanced by plaintiffs. Accordingly, the court will deny defendant's motion for summary judgment.[2]

**2. The Requirements of Section 505**

Georgia-Pacific asks the court to dismiss this action, pursuant to Fed.R.Civ.P. 12(b)(1) and (6), on the grounds that plaintiffs' claims are inconsistent with the requirements of the Clean Water Act's citizen suit provision. The court will now consider each of defendant's objections in turn.

Dismissal of a complaint for failure to state a claim is permissible only when it appears that a plaintiff can prove no set of facts sufficient to support its claims for relief. *Conley v. Gibson,* 355 U.S. 41, 44–45, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Bryson v. Brands Insulations, Inc.,* 621 F.2d 556, 559 (3rd Cir.1980). Accordingly, the court has viewed plaintiffs' allegations in the light most favorable to them, and has drawn all reasonable inferences in their favor. *Bryson, supra; Mortensen v. First Federal Savings and Loan Association,* 549 F.2d 884, 891 (3rd Cir. 1977).

**i. Relief for Past Violations**

■ The first alleged defect in the complaint is that plaintiffs seek relief based on past violations. According to defendant, the citizen suit provision only permits prospective relief for ongoing violations.

There is no merit to this argument. Numerous cases in this district and elsewhere have declared that the Clean Water Act does not limit citizen plaintiffs to prospective relief. *United States v. Earth Sciences,* 599 F.2d 368, 376 (10th Cir.1979); *SPIRGNJ v. Tenneco Polymers,* 602 F.Supp. 1394, 1399 (D.N.J.1985); *SPIRGNJ v. Monsanto Co.,* 600 F.Supp. 1474, 1476–77 (D.N.J.1985); *SPIRGNJ v. Anchor Thread Co.,* 22 ERC 1150, 1154 (D.N.J. 1984); *Sierra Club v. Raytheon Corp.,* 22 ERC 1050, 1053–55 (D.Mass.1984); *Sierra Club v. Aluminum Co. of America,* 585 F.Supp. 842, 20 ERC 1916, 1926 (N.D.N.Y. 1984). These decisions are based on unmistakeable evidence in favor of such a result in the legislative history of the Clean Water Act and the language of the statute itself.

In suits under Section 505 of the Clean Water Act, citizens have access to the same remedies available to the EPA. *Middlesex County Sewerage Authority v. National Sea Clammers Association, supra,* 453 U.S. at 13–14, 101 S.Ct. at 2622–23. Section 505(a) defines the right of citizens to seek civil penalties with reference to Section 309(d) of the Act, which permits such penalties against any party which "violates" the Act. This language has been held to sustain civil penalties for past violations. *See United States v. Earth Sciences, supra,* 599 F.2d at 376. Such an interpretation is supported by the remarks of Senator Muskie, primary Senate sponsor of the legislation which, in modified form, became the Clean Water Act of 1972. Regarding the final version of the citizen suit provision, Senator Muskie stated that

---

**2.** The court also notes that ¶¶ 7 and 9 of the complaint contain allegations of individualized harm to plaintiffs' members of sufficient specificity to withstand a motion to dismiss. *Accord SPIRGNJ v. Monsanto Corp.,* 600 F.Supp. 1479, 1484 (D.N.J.1985); *Sierra Club v. Aluminum Corp. of America,* 585 F.Supp. 842, 20 ERC 1916, 1919, 1924 (N.D.N.Y.1984). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Consequently, it is unnecessary for an environmental group to identify, and sufficient for it to allege, particular harm to particular members, when faced with a motion to dismiss. On the other hand, affidavits of the kind presented by plaintiffs are essential to defend against a Rule 56 motion, once a defendant challenges the factual basis for allegations of individualized harm contained in the complaint. Of course, an organization need only show specific harm to one of its members in order to defeat a motion for summary judgment as to standing. *See Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. at 2211.

a citizen has the right under Section 505 to bring an action for an appropriate remedy in the case of any person who is alleged to be, or to *have been,* in violation, whether the violation be a continuous one, or an occasional or sporadic one. A Legislative History of the Water Pollution Control Act amendments of 1972, Senate Committee on Public Works, 93d Cong., 1st Sess. (January 1973) at 179 (emphasis added). Furthermore, to allow defendant to avoid liability for past violations would severely lessen the intended deterrent effect of the Act's civil penalty provisions. *SPIRGNJ v. Anchor Thread Co., supra,* 22 ERC at 1154; *Sierra Club v. Aluminum Co. of America, supra,* 585 F.Supp. 842, 20 ERC at 1926.

The cases cited by defendant for the contrary proposition are unpersuasive. Several consider and reject a private right of action for damages under Section 505 based on past violations. *See City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1145–46 (E.D.Pa.1982); *Love v. New York State Department of Environmental Conservation,* 529 F.Supp. 832, 838 (S.D.N.Y.1981). Plaintiffs have made no such claims; thus, such authorities are simply inapplicable to this case. *Accord SPIRGNJ v. Monsanto Co.,* 600 F.Supp. 1479, 1486 (D.N.J.1985). Two other decisions offered by defendant appear to disfavor citizen suits based on past violations. *City of Evansville v. Kentucky,* 604 F.2d 1008 (7th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980); *Hamker v. Diamond Shamrock Chemical Co.,* 756 F.2d 392 (5th Cir.1985). In both of these cases, however, claims for damages played a central role and had a heavy influence on the court's resistance to civil penalties for past violations of the Clean Water Act.[3] Consequently, both cases are analogous to the results in *Stepan Chemical Co., supra,* and *Love v. NYS Dept. of Environmental Conservation, supra,* and may be limited to their specific facts.

■ Defendant claims that if Section 505 allows suits for past violations, plaintiffs may at most seek civil penalties and are barred from receiving injunctive relief. Accordingly, defendant asks the court to strike from the complaint plaintiffs' requests for equitable relief.

While defendant has argued at length that prospective relief for past misconduct is unfair, defendant has presented no specific authority for the proposition that such relief is unavailable. The court finds plaintiffs' request for injunctive relief to be consistent with the language in Section 505(a) permitting a citizen to seek "to enforce ... an effluent standard or limitation." The parties' debate as to whether Georgia-Pacific's recent behavior merits prospective sanctions is premature. It is enough that plaintiffs have made a colorable claim that defendant's violations of the Clean Water Act have been chronic and have continued to occur as recently as December, 1983, three months prior to the filing of the complaint. This constitutes a valid basis for plaintiffs' assertion that defendant's misconduct is likely to continue in the future, and therefore, that injunctive relief may be required to enforce defendant's discharge permit. *See United States v. Detrex Chemical Industries, Inc.,* 393 F.Supp. 735, 737 (N.D.Ohio 1975).

The nature and extent of past violations are good indicators of a defendant's future behavior. *See, e.g., S.E.C. v. Bonastia,* 614 F.2d 908, 913 (3rd Cir.1980). Nevertheless, the court need not now address the proper standards for determining whether plaintiffs are actually entitled to injunctive relief.

---

**3.** In *City of Evansville v. Kentucky, supra,* the court criticized citizen suits for past violations. 604 F.2d at 1014. This passage of the court's opinion was dictum. The conclusion that suits under Section 505 for past violations are barred was intimately connected to the court's analysis rejecting a private right of action for damages under Section 505. The court erred in failing to distinguish between the two issues in this regard. The *Hamker* court was concerned that plaintiff invoked Section 505 merely as a vehicle to assert claims for damages under pendent state law causes of action. 756 F.2d at 396. Such is plainly not the case in this action.

### ii. Diligent Prosecution

■ Under Section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B), no citizen suit may be initiated to enforce a discharge permit standard "if the [EPA] or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard." In some instances, agency proceedings may be equivalent to action in a court for purposes of Section 505(b)(1)(B). *Baughman v. Bradford Coal Co., Inc.,* 592 F.2d 215, 217–18 (3rd Cir.1979). Diligent prosecution is considered to be underway, so as to bar a citizen suit, when an agency is engaging in activity in which it has the "power to accord relief which is the substantial equivalent to that available to the EPA in federal courts." *Id.* at 219.

Defendant originally moved to dismiss on the grounds that EPA and DEP have been monitoring Georgia-Pacific's compliance with its NPDES/NJPDES throughout the period covered by plaintiffs' lawsuit. According to defendant, the Consent Judgment of May 12, 1981 reflected prosecution "in a court" of all alleged violations through that date; administrative surveillance of Georgia-Pacific by EPA and DEP since then constitute the equivalent of actual prosecution. Georgia-Pacific also argues that various EPA and DEP reports, covering defendants emissions between October, 1980 and May, 1984, demonstrate that both agencies found further enforcement action unnecessary because the company has been in full, or at least substantial compliance with the Clean Water Act. Defendant's Reply Brief in Support of Motion to Dismiss, at 23–24.

Since entry of the Consent Judgment in this case, there has been no actual prosecution of an action in court against defendant by EPA or DEP. Nor has either agency taken any administrative action with respect to defendant which is the functional equivalent to court action, sufficient to satisfy Section 505(b)(1)(B). Under Section 309 of the Act, 33 U.S.C. § 1319, EPA is required to go to federal court to obtain civil penalties or injunctive relief to enforce the Act. Because EPA cannot on its own provide relief equivalent to that available in federal court, EPA administrative enforcement activity of the sort present in this case is incapable of barring a citizen suit. *SPIRGNJ v. Fritzsche, Dodge & Olcott,* 759 F.2d 1131, 1138–39 (3rd Cir.1985).

DEP proceedings leading up to the issuance of defendant's new discharge permit also are not the functional equivalent of court action under the test set forth in *Baughman v. Bradford Coal Co., Inc., supra.* Such administrative activity could not have led to sanctions against defendant for violations of its old permit, such as DEP might obtain in court.

Defendant's allegations as to the views expressed by EPA and DEP concerning defendant's compliance with the Act between 1980 and 1984 are irrelevant for purposes of assessing plaintiff's right to bring this lawsuit. Section 505(b)(1)(B) was intended to preclude citizen suits only when comparable action by an administrative agency is underway, not whenever an agency sees fit to approve the actions of private parties subject to its jurisdiction. Defendant's interpretation of the Act would render citizen suits impossible when they are required most: instances where an agency encourages a polluter to believe its unlawful behavior will go unpunished.

Defendant raises a legitimate question as to the scope of the Consent Judgment of May 12, 1981. While the court must address the issue in order to determine the extent of defendant's liability, if any, the issue is not germane to plaintiffs' compliance with Section 505(b)(1)(B).

In light of the foregoing, defendant's motion to dismiss on the grounds that plaintiffs have failed to comply with Section 505(b)(1)(B) of the Clean Water Act is denied.

### iii. Notice of Intent to Sue

■ Defendant also asks the court to exercise its powers of equity to dismiss the Complaint for being filed over one year after plaintiffs gave notice of their intent to sue. Plaintiffs are conceded to have satisfied Section 505 (b)(1)(A) of the Act, 33

U.S.C. § 1365(b)(1)(A), which provides that no citizen suit may be commenced unless plaintiff has given sixty days' notice of alleged violations of the Act to EPA, the State in which the violations allegedly took place, and the supposed violator. There is no dispute that on March 10, 1983, plaintiffs notified all relevant parties of their intent to sue defendant based on allegations that defendant committed various violations of its NPDES/NJPDES permit. Nevertheless, defendant contends that the complaint, filed on March 19, 1984, is barred by the doctrine of laches. Defendant asserts that plaintiffs' claims are "stale" and that plaintiffs' failure to act more quickly is inconsistent with the goals of the citizen suit provision.

Defendant's arguments on this point are frivolous. Defendant does not seriously contest plaintiffs' contentions that the delay in the filing of this lawsuit is largely attributable to plaintiffs' attempt to reach an amicable resolution of its claims with defendant. Furthermore, plaintiffs have supplemented their original allegations as to defendant's permit violations by specifying numerous similar incidents during the period from June, 1982 through December, 1983, the latest of which allegedly occurred just three months prior to the filing of the Complaint. Plaintiffs' Brief in Support of Partial Summary Judgment, Appendix II, Exhibit D. Accordingly, this portion of defendant's motion to dismiss is denied.

### iv. Authorization for Novel Equitable Relief

■ Initially, defendant asked the court to strike two aspects of the relief sought by plaintiffs. By now it is clear that plaintiffs do not seek an award of damages. Consequently, this aspect of the motion to dismiss is moot. Defendant still objects, however, that there is no statutory basis for plaintiffs' request, in paragraphs C and D of the Complaint, that the court permit plaintiffs to establish and operate a one-year discharge monitoring program to be financed by Georgia-Pacific. According to defendant, Section 505 of the Act specifically limits the relief available to citizen plaintiffs so as to preclude the extraordinary remedy SPIRG and FOE propose.

The remedy challenged by defendant would (1) "[a]uthorize ... plaintiffs ... to sample or to arrange sampling" of pollutant discharges from defendant's plant and (2) "[o]rder defendant to provide the plaintiffs ... with a copy of all reports and other documents which the defendant submits to the Federal or State government regarding the defendant's NPDES/NJPDES permit at the time it is submitted to these authorities." Complaint, ¶¶ C, D. Plaintiffs maintain that such measures are "necessary to provide complete relief" in light of the failure of EPA and DEP to seek any sanctions against defendant since May, 1981. Plaintiffs' Brief in Opposition to Motion to Dismiss at 32–33.

The broad language of Section 505(a) constitutes the basis for plaintiffs' novel request for injunctive relief: "the district courts shall have jurisdiction ... to enforce ... an effluent standard or limitation." Plaintiffs also contend that a federal trial court has great leeway in implementing its equitable powers, in order to secure "the enforcement of prohibitions contained in a regulatory enactment." *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 334–336, 4 L.Ed.2d 323 (1960). *See also Porter v. Warner Holding Co.,* 328 U.S. 395, 397–98, 66 S.Ct. 1086, 1088–89, 90 L.Ed. 1332 (1946).

Defendant has failed to persuade the court that the remedy proposed by plaintiffs may not, as a matter of law, be required, if it is deemed necessary to assure effective enforcement of the Clean Water Act. In light of the detailed discharge permit program set forth in the Act, which requires periodic evaluation of permittee DMRs and NCRs, plaintiffs carry a heavy burden to show that a supplementary sampling and reporting program, involving private parties, is required. Furthermore, the present agency in charge of enforcing defendant's permit, DEP, is not the same entity plaintiffs charge with ineffective enforcement of defendant's NPDES permit

through 1984. At this stage of the litigation, however, the court need not decide whether any particular form of relief is appropriate. Accordingly, the court will deny this portion of defendant's motion to dismiss.

**Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs ask the court for summary judgment only as to the issue of liability. In support of their motion, plaintiffs present the court with defendant's water pollution discharge permits (federal and state), Plaintiffs' Brief in Support of Partial Summary Judgment, Appendix II, Exhibits A, B, C, and defendant's monthly discharge monitoring reports to the EPA, *id.*, Exhibit D. By comparing the effluent limits in defendant's permits and the discharge levels recorded in defendant's DMRs, plaintiffs identify 162 alleged violations of the permits between January 1, 1979 and December 31, 1983. According to plaintiffs, each of these instances in which defendant's discharges exceeded prescribed limits constitutes a *per se* violation of the Clean Water Act.

Georgia-Pacific does not dispute plaintiffs' factual allegations as to the content of its discharge permits and DMRs. Nor does defendant contest plaintiffs' contentions that Georgia-Pacific exceeded its NPDES/NJPDES discharge limits 162 times since December 31, 1978. Furthermore, defendant concedes that the Clean Water Act imposes strict liability for violations of its provisions. As a result, the issues outstanding with respect to plaintiffs' Rule 56 motion are quite narrow. In particular, defendant asserts that summary judgment in plaintiffs' favor is barred by two questions of fact: (1) whether defendant's exceedences of its permit discharge limits constitute violations of the Clean Water Act; and (2) whether there has been a lack of diligent prosecution of such alleged violations by relevant government agencies. Defendant also maintains that an issue of fact exists as to whether defendant's alleged violations prior to May 12, 1981 have already been adjudicated by the Consent Judgment agreed to on that date by defendant and EPA.

**1. Permit Violations Recorded in DMRs**

██ Defendant contends that not all violations of limits specified in a water pollution discharge permit and reported in a company's DMRs constitute violation of the Act. Georgia-Pacific claims the EPA expects permittees to exceed such standards upon occasion. According to defendant, EPA sets permit discharge limits based on statistical calculations which assure that "no permit ... will be complied with 100% of the time." Defendant's Brief in Opposition to Motion for Partial Summary Judgment at 8–9; *Id.*, Exhibit B at 6. Consequently, defendant asks the court to find that "there is more to a determination of compliance [with a permit] ... than simply checking for an exceedence reported in a DMR," *id.* at 10, and that "[i]t is the 'long-run' performance [of a permittee] which will be assessed in determining whether compliance has been achieved by a facility." *Id.* at 8–9.

Based on the foregoing analysis, defendant asserts that under the Clean Water Act, a permittee is only strictly liable for exceeding a permit limit when the permittee fails to rebut uncontradicted or unambiguous evidence of such a violation. *Id.* at 11. Defendant presents numerous exhibits which purport to sustain a factual inference that the company has complied with its permit despite having exceeded the limits set forth therein.

It is well established that records required to be kept by law, such as DMRs, may be deemed to be admissions for purposes of establishing civil liability. *Garner v. United States*, 424 U.S. 648, 665, 96 S.Ct. 1178, 1188, 47 L.Ed.2d 370 (1976). Such a practice has been approved for reports kept pursuant to requirements of the Clean Water Act. *United States v. Ward*, 448 U.S. 242, 254, 100 S.Ct. 2636, 2644, 65 L.Ed.2d 742 (1980). Consequently, there can be no question that the data disclosed in defendant's DMRs may be accepted as true. Furthermore, it is clear that failure to comply with an NPDES permit constitutes a violation of the Act. 33 U.S.C.

§§ 1311(a), 1342(k). The question remains however, whether an exceedence of an NPDES permit limit constitutes conclusive evidence of noncompliance with the permit, that is, of a violation of the Act.

There is little authority for defendant's position that exceedences of permit limits constitute prima facie evidence of noncompliance with the Act, which may be rebutted by proof that the EPA or a comparable state agency does not consider the exceedences serious enough to merit sanctions. Furthermore, such a position is illogical and completely inconsistent with the policies underlying the citizen suit provision. Section 505 of the Act is intended to permit private attorneys general to come forward when public enforcement has not occurred. Defendant's interpretation of Section 505 would allow unwillingness to prosecute on the part of regulators to be a defense to private enforcement actions.

The proposition that permit violations revealed in DMRs constitute only strong evidence of noncompliance with the Act is inconsistent with the statute's legislative history. The Clean Water Act represents a major departure in water pollution abatement strategy. In the Act, Congress turned away from direct regulation of water quality and established a NPDES as a means to improve water quality indirectly, by regulating effluent levels. This approach was intended to achieve "swift and direct" enforcement based on "simple numerical standards." *Corn Refiners Association, Inc. v. Costle,* 594 F.2d 1223, 1226 (8th Cir.1979). *See also* 44 Fed.Reg. 3263 (June 7, 1979) ("Congress intended that prosecution for permit violations be swift and simple."). Under the Act, the NPDES permit "defines and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations." *EPA v. Water Resources Board,* 426 U.S. 200, 204, 96 S.Ct. 2022, 2024, 48 L.Ed.2d 578 (1976).

Courts interpreting the Act have been very reluctant to limit the legal effect of permit violations revealed in DMRs. For instance, defendants may not avoid summary judgment as to liability under the Act simply by challenging the accuracy of the data set forth in DMRs. *SPIRGNJ v. Tenneco Polymers, supra,* 602 F.Supp. at 1400; *Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 452 (D.Md.1985); *Sierra Club v. Simkins Industries, Inc.,* 617 F.Supp. 1120, 1127–28 (D.Md.1985); *SPIRGNJ v. Fritzsche, Dodge & Olcott,* 579 F.Supp. 1528, 1538–39 (D.N.J.1984), *aff'd,* 759 F.2d 1131 (3rd Cir.1985). *But cf. Friends of the Earth v. Facet Enterprises,* 618 F.Supp. 532, 536 (W.D.N.Y. 1984). In *SPIRGNJ v. Tenneco Polymers, supra,* the court rejected a more ambitious attempt to rebut the validity of violations revealed in DMRs. As in this case, the defendant argued that a high number of the alleged violations cited in defedant's DMRs were "within the margin of analytic error." The trial court found such a claim did not consitute a basis for denial of summary judgment. 602 F.Supp. at 1400.

There is little substance to the evidence defendant presents to show that discharges in excess of permit limits are not necessarily violations of the Clean Water Act. First, defendant relies on various documents which suggest EPA sets discharge limits at levels which it expects to be exceeded, although infrequently. *See, e.g.,* "Development Document for Effluent Limitations Guidelines and Standards for the Pulp, Paper and Paperboard Point Source Category," U.S. EPA, Washington, D.C., October, 1982 ("Development Document"), Defendant's Brief in Opposition to Motion for Partial Summary Judgment, Exhibit F. Defendant fails to come forward with any proof, however, that the adoption of such a methodology indicates Congress' willingness to allow defendants to challenge exceedences on the grounds that they are "minor" and resulted from "normal variations" in effluent levels. On the contrary, the very documents cited by defendant indicate that EPA takes into account the natural variation in effluent levels in setting discharge limits. Development Document at 470. Thus, any discharge in excess of permit limits is almost certain to reflect the

kind of irresponsible activity the Act is designed to prevent and punish.

Defendant also cites regulations which allow dischargers to contest liability for exceeding a permit limit by arguing that it constitutes an "upset," that is, an "exceptional incident in which there is unintentional and temporary non-compliance." 40 C.F.R. § 122.41(h)(1); N.J.A.C. 7:14A–3.-10(c). These provisions clearly concern isolated and unusual occurrences. They do not raise an inference that Congress intended for courts to examine the factual circumstances underlying each of a series of exceedences over an extended period of time. Therefore, the "upset" regulations are irrelevant to this case, which involves more than one hundred and fifty exceedences over five years.

Even if the court were to credit defendant's interpretation of the Act and allow defendant to rebut the prima facie evidence of liability established by defendant's DMRs, the company would be no better off. The factual material defendant has submitted regarding the innocence of its behavior fails to raise an issue of fact as to the company's liability for the violations alleged by plaintiffs.

Defendant attempts to create an issue of fact as to liability by offering documentation of assurances the company received from EPA and DEP, in reports and personal communications. The message allegedly conveyed by the agencies was that Georgia-Pacific's record between 1979 and 1984 contains no evidence of serious deviations from its permit limits sufficient to constitute noncompliance with the Act.

Contrary to defendant's assertions, virtually every official report cited by plaintiffs acknowledges defendant's noncompliance with the Act. EPA seems to recognize that defendant has violated its permit; however, the agency characterizes such noncompliance as of little concern. *See* Defendant's Brief in Opposition, Exhibit G, item 2(a), (b), (d) ("The permitee has been in substantial compliance."), (e) ("No significant viola-

tions."). Likewise, the personal assurances defendant refers to seem to reflect EPA's and DEP's enforcement priorities rather than a legal opinion as to liability.[4] Indeed, such representations merely underline the important role citizen suits may play in providing an alternative means of enforcing the Clean Water Act. Evidence of regulators' views of the seriousness of a permittee's misconduct is irrelevant to the issue of liability. In a Section 505 suit, such evidence is germane, if at all, to a court's determination as to the nature and extent of the relief which is appropriate to remedy the violations in question.

### 2. Diligent Prosecution

The subject matter of this lawsuit is limited to defendant's permit violations not covered by the Consent Judgment entered on May 12, 1981. In connection with its motion to dismiss, Georgia-Pacific argued that plaintiffs may not bring a citizen suit for the company's permit violations because EPA and DEP have engaged in diligent efforts to assure the company's compliance therewith since May 12, 1981. Defendant makes similar arguments in response to plaintiffs' motion for partial summary judgment. According to Georgia-Pacific, an issue of fact exists as to whether EPA and DEP administrative actions subsequent to the Consent Judgment were the equivalent of "a civil ... action in a court of the United States." 33 U.S.C. § 1365(b)(1)(B).

Earlier in its opinion, the court rejected such arguments. As a matter of law, EPA administrative enforcement activity of the kind present in this case cannot preclude a citizen suit. *SPIRGNJ v. Fritzsche, Dodge & Olcott, supra,* 759 F.2d at 1138–39. Prior to 1984, DEP was not involved in any proceedings with respect to defendant which could have resulted in sanctions for violations of the Clean Water Act. DEP simply monitored defendant's compliance with its federal permit prior to issuance of

---

**4.** In any case, the hearsay testimony as to such assurances presented by defendant, Defendant's Brief in Opposition to Motion for Partial Summary Judgment, Exhibits B, D, is insufficient to raise an issue of fact as to liability.

a state discharge permit. As the court previously noted, such activities are also plainly insufficient to bar this action.

### 3. Scope of the May, 1981 Consent Judgment

■ The Consent Judgment which resolved the previous lawsuit against defendant forecloses subsequent litigation as to all claims adjudicated therein. The Consent Judgment purports to reach a final judgment as to "all claims of the United States asserted in this action." Consent Judgment, May 12, 1981, ¶ 3.

The ambiguity of the language in the Consent Judgment has produced a dispute between the parties as to its scope. The logical place to look for the meaning of this language is the government's own statement of its claims. The Complaint, filed on May 17, 1979, requests relief from defendant's violation of its NPDES permit "From January 31, 1977 to the present ... including those occasions specified below: [list of dates between February 1, 1977 and January 1, 1979]." Complaint, ¶ 10.

The language of the Consent Judgment, when read together with the language in the Complaint, indicates that plaintiffs are barred from asserting claims deriving from any time prior to the filing of the Complaint. On the other hand, plaintiffs assert that the Consent Judgment covers only those claims specified, through December, 1978. This interpretation is supported by an internal memorandum prepared by the EPA. "Fact Sheet, Georgia-Pacific Corporation ... NPDES Permit No. NJ0004669," Plaintiffs' Supplemental Brief in Support of Motion for Partial Summary Judgment, Attachment B, at 2, 3. It is noteworthy however, that the same document also characterizes the present lawsuit as covering only the violations originally specified in plaintiffs' Complaint: exceedences through May, 1982. *Id.* at 3. As this case has been deemed to incorporate other violations only specified by plaintiffs some time after the filing of the Complaint, it seems reasonable

to conclude that the previous litigation covered violations referred to in the Complaint, but not specified therein. Nevertheless, the EPA document creates an issue of fact as to plaintiffs' right to pursue claims based on defendant's violations between December 31, 1978 and May 17, 1979.

Defendant maintains that the Consent Judgment precludes litigation as to all alleged violations prior to entry of the same, on May 12, 1981. This claim is founded principally on language in a draft of an internal EPA memorandum. Defendant's Brief in Opposition to Motion for Partial Summary Judgment, Exhibit G. This evidence is of no help to defendant as the final version of the memo, discussed above, supports the much earlier cut-off date favored by plaintiffs: December 31, 1978. Defendant has offered no other significant evidence to support its theory. Consequently, defendant is unable to raise an issue of fact as to the effect of the May, 1981 Consent Judgment to preclude all the company's violations through the filing date of the Consent Judgment.

In light of the foregoing, the court will grant plaintiffs' motion for partial summary judgment as to all defendant's permit violations between June 1, 1979 and December 31, 1983.[5] The court will deny plaintiffs' motion, without prejudice, as to defendant's violations between January 1, 1979 and June 1, 1979.

### Conclusion

Defendant's motion for summary judgment, which is brought on the grounds that plaintiffs lack standing to maintain this lawsuit, is denied. Defendant's motion to dismiss the Complaint for failure to state a claim under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, is likewise denied. The court will grant plaintiffs' motion for summary judgment as to all defendant's violations of its NPDES/NJPDES permit between June 1, 1979 and December 31, 1983. Plaintiffs' motion is denied, without prejudice, as to defendant's violations

---

5. As plaintiffs have specified defendant's violations by month, based on defendant's DMRs, the court will grant summary judgment as to all violations beginning with the first full month after the filing of the Consent Judgment: June, 1979.

which occurred between January 1, 1979 and June 1, 1979. An appropriate order will be entered.