PUBLIC INTEREST RESEARCH
GROUP OF NEW JERSEY,
INC., et al., Plaintiffs,

v.

NEW JERSEY EXPRESSWAY
AUTHORITY, Defendant.

Civ. No. 91–1701.

United States District Court,
D. New Jersey.

Dec. 3, 1992.

Bruce J. Terris, Monica Wagner, Robert D. Parrish, Terris, Pravlik & Wagner, Washington, DC, Edward Lloyd, Newark, NJ, for plaintiffs.

Joseph G. Gindhart, Atlantic City, NJ, for defendant.

## OPINION

GERRY, Chief Judge.

This is a citizen suit brought under § 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365, by the Public Interest Research Group of New Jersey ("NJPIRG") and Friends of the Earth ("FOE") against the New Jersey Expressway Authority ("NJEA"). Plaintiffs allege that defendant has violated provisions of its discharge permit issued pursuant to § 402(a) of the Act, 33 U.S.C. § 1342(a), for the Frank S. Farley Service Area ("Service Area") on the Atlantic City Expressway. This permit sets limits on the amount of pollutants that defendant may discharge into the waterways near the Service Area.

Since the filing of this suit, defendant has ceased discharging waste water into these waters. Plaintiffs allege that prior to such cessation, however, defendant committed 2,435 violations of the discharge limits, 1,870 violations of the monitoring requirements, and 632 violations of the reporting requirements imposed by the permit. Plaintiffs are seeking an order imposing statutory penalties for these violations.[1] The case is presently before us on plaintiff's motion for partial summary judgment as to liability and defendant's cross-motion for summary judgment.[2] For the reasons set forth below, plaintiffs' motion will be granted, and defendant's motion will be denied.

## I. Factual Background

The Water Pollution Control Act, 33 U.S.C. § 1251 et seq., prohibits discharge of any pollutants into the nation's waters except

---

1. Plaintiffs have withdrawn their request for an injunction requiring defendant to notify plaintiffs within 30 days of a resumption of discharge from the Service Area.

2. Defendant characterizes its motion as a motion to dismiss; but since it relies on affidavits and other submissions outside the pleadings, the court will treat it as a summary judgment motion. See Fed.R.Civ.P. 12(b).

pursuant to specific authorization as provided for in the Act. Pursuant to Title IV of the Act, 33 U.S.C. § 1341–1345, discharge permits can be issued to particular entities, allowing them to discharge limited amounts of pollutants into surface waters. The permit involved in this case was issued pursuant to the National Pollutant Discharge Elimination System ("NPDES") as created by § 402(a)(1) of the Act, 33 U.S.C. § 1342(a)(1). Section 402(a)(1) authorizes the Administrator of the United States Environmental Protection Agency ("EPA") to issue permits authorizing the limited discharge of pollutants in accordance with national standards promulgated by the Administrator for each of various statutorily-created categories of industrial and commercial discharge sites or "point sources."

NPDES permits require permittees to establish and maintain records; to install, use, and maintain monitoring equipment; to sample effluent; and to submit regular reports to the Environmental Protection Agency. *See* 33 U.S.C. § 1318(a)(4)(A). These reports are called "discharge monitoring reports" ("DMRs") and must be submitted at regular intervals specified in the permit. *See* 40 C.F.R. § 122.41(1)(4) (1991). Federal regulations provide for criminal penalties for the submission of false information in these reports, *see* 40 C.F.R. § 122.41(k)(2) (1991), and impose an affirmative obligation on permittees to correct any past errors or omissions in reporting of which they subsequently become aware. *See* 40 C.F.R. § 122.42(1)(8) (1991).

In 1982, the EPA delegated responsibility to the New Jersey Department of Environmental Protection and Energy ("Department") to administer the NPDFS program in New Jersey. 47 Fed.Reg. 17331 (1982). On December 10, 1985, the Department issued an NPDES permit to defendant, NJEA, effective February 1, 1986, authorizing defendant to discharge limited quantities of pollutants from its Service Area waste water treatment plant through one discharge point[3] in accordance with conditions set forth in the permit. The permit imposed certain interim effluent limitations for the period of February 1, 1986 through May 31, 1988 and final effluent limitations which became effective on June 1, 1988. The permit expired on January 31, 1991. EPA regulations, however, provide that the terms of an expired permit remain in effect until the effective date of a new permit. *See* 40 C.F.R. § 122.6 (1991). No new permit has apparently been issued.

In addition to setting quantitative discharge limitations on a series of specific pollutants, the permit also imposed a number of obligations on defendant with respect to monitoring and reporting. Thus, the permit required that all monitoring results obtained by defendant be included in its DMRs, and that defendant retain records of all monitoring information for a period of at least five years.

At the time the permit was issued, the plant was not designed to meet either the interim or the final effluent limitations without major modifications. Defendant had agreed to construct a new sewage treatment plant that would be capable of meeting the permit's effluent limitations, but this project had to be abandoned when defendant was unable to obtain the necessary regulatory approval. Defendant then developed a new plan to construct a force main to transmit the waste water from the Service Area to the proposed Atlantic County Utilities Authority ("ACUA") Coastal Alternative Interceptor Line, which would transport it out of the area entirely and avoid any discharge whatever into Makepeace Lake or surrounding waters. The process of obtaining the necessary regulatory approvals from various state agencies for this project was apparently time consuming, however, and was not completed until January 10, 1990. Meanwhile, construction of the ACUA Coastal Alternative Interceptor itself, to which the force main was supposed to connect, was delayed for two years because of litigation over the funding source for the project. Thus, both the force main and

---

**3.** The actual location of this discharge point has been a source of some confusion in this case. The permit states that the waste water is discharged into a "tributary of Makepeace Lake."

In fact, the parties now agree that the effluent is discharged into a drainage ditch which flows into an area of wetlands adjacent to Makepeace Lake.

the Interceptor are still under construction but are supposed to be completed and able to transport waste water away from the Service Area within months.

Meanwhile, the Service Area's waste water treatment plant has been shut down since September 11, 1991, and the waste water has been hauled by private carrier from the Service Area to the ACUA's Plant for processing. Defendant asserts that it will continue to do this until the force main is ready for operation. Thus, both parties agree that no waste water is currently being discharged into Makepeace Lake or surrounding waters, and accordingly no violations of the Act are presently occurring.

In 1988, when it became clear that defendant would not be able to meet the deadline for compliance with the final effluent limitations, the Department brought its own compliance action. It decided not to impose monetary penalties on defendant for its failure to comply with the permit, but instead required defendant to enter into an enforcement agreement, referred to as the "Memorandum of Understanding" ("MOU"). The MOU required defendant to construct the force main to transfer waste water to the ACUA Coastal Alternative Interceptor line and set a schedule for such construction. It also substantially relaxed both the interim and final effluent limitations contained in the permit, and indicated that these new relaxed limitations would remain in effect until the conveyance of the Service Area's waste water to the ACUA system.

In support of their motion, plaintiffs have submitted copies of defendant's DMRs and laboratory reports from 1986 through 1991, which they contend demonstrate that defendant committed 2,435 violations of the discharge limits, 1,870 violations of the monitoring requirements, and 632 violations of the reporting requirements imposed by the permit. The monitoring violations consisted of defendant's failure to monitor for particular pollutants on 1,854 occasions and its failure to take the kind of sample required by the

permit on 16 occasions. The reporting violations consisted of: 1) defendant's underreporting of the total number of discharge violations on 113 occasions, resulting in 322 unreported violations; 2) defendant's failure on 200 occasions to accurately report the frequency of monitoring; 3) defendant's reporting of an incorrect value for its lead, copper, and zinc parameters in every DMR from February 1986 through August 1988 by using an incorrect conversion factor to convert milligrams (in which measurements were made) to micrograms (in which values were to be reported); 4) defendant's miscalculation of mass value parameters and BOD percent removal figures on 12 and 16 occasions, respectively;[4] and 5) defendant having simply misrecorded laboratory report values on DMRs or made simple mathematical errors in determining reported figures.

## II. Discussion

Plaintiffs have moved for summary judgment as to liability only, and defendant has cross-moved for summary judgment. Defendant does not dispute plaintiffs' contentions as to the number of permit violations that occurred. Rather, it argues that it may not be held liable for those violations for a number of reasons. Defendant argues first, that the case must be dismissed as moot; second, that plaintiffs lack standing to bring this action; third, that prior enforcement action against defendant by the Department precludes this citizen suit; and finally, that defendant can only be held liable for violations of the more lenient MOU, not the NPDES permit. We address each of these arguments in turn.

### A. *Mootness*

In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), the Supreme Court held that the Clean Water Act does not permit citizen suits—even for penalties—that are based on "wholly past violations." This holding was not based on the

---

4. The EPA has specified the methodology to be used in calculating these figures in its "NPDES Self–Monitoring System User Guide," and the Department has done the same in its "Instruc-

tion Manual for Discharge Monitoring Reports." Plaintiffs have redone these calculations according to this methodology in order to identify these errors.

common law doctrine of mootness, but rather on the language of the statute itself, the citizen suit provision of which is worded in the present tense only, allowing citizen suits against any person "alleged to be in violation" of the Act. 33 U.S.C. § 1365(a).

*Gwaltney,* however, does not require a court to dismiss an otherwise proper suit when the defendant ceases the allegedly illegal conduct during the pendency of the litigation. *See id.* at 66–67, 108 S.Ct. at 386–87; *see also United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Rather, *Gwaltney* holds that jurisdiction is proper under the Clean Water Act as long as a citizen plaintiff is able to make good faith allegations of a continuing likelihood of ongoing violations at the time the suit is filed. *See Gwaltney,* 484 U.S. at 64, 108 S.Ct. at 385. Once such jurisdiction does attach, the court can assess penalties for all current *and* past violations of the Act, even if it is later proved that no violations actually occurred subsequent to the filing of the complaint. *See Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d 690, 696 (4th Cir.1989) (on remand from Supreme Court); *PIRG v. Carter–Wallace, Inc.,* 684 F.Supp. 115 (D.N.J.1988).

Here, although defendant is at this time no longer violating its permit, it did continue to commit violations after the filing of the complaint.[5] The allegations of continuing violations in the complaint, therefore, appear to have been made in good faith, and jurisdiction is accordingly proper under *Gwaltney.*

### B. *Standing*

The standing requirement arises from Article III of the United States Constitution, which limits the jurisdiction of the federal courts to the resolution of actual cases or controversies. Thus, in order to have standing to sue, a party must have "personally ... suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Vil-*

*lage of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

Standing need not be proven at the outset of a case in order to invoke the court's jurisdiction. Just like a plaintiff's substantive claims, the facts necessary to support standing need only be alleged in the complaint and need not be proven until trial. As with any other factual issue, however, it may be resolved prior to trial if either party can establish that it is entitled to summary judgment. *See Gwaltney,* 484 U.S. at 65–66, 108 S.Ct. at 385–86. Here we have before us cross-motions for summary judgment on the issue of standing. Accordingly, either side, in order to prevail, must demonstrate to the court that there are no issues of disputed fact material to our standing inquiry. *See* Fed. R.Civ. P. 56(c).

An organization can have standing to represent the interests of its members in a lawsuit when,

> (a) its members would otherwise have standing to sue in their own right;
>
> (b) the interests it seeks to protect are germane to the organization's purpose; and
>
> (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Defendant argues that the first of these requirements is not satisfied here because none of plaintiffs' members meet the requirements for individual standing.

An individual has standing to sue if: 1) she has personally suffered an actual or threatened injury; 2) the injury can be fairly traced to the challenged action; and 3) the injury is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). Plaintiffs argue that their members do meet these requirements. We agree.

---

**5.** This suit was filed on April 19, 1991. The Service Area sewage treatment plant was shut down on September 11, 1991.

## 1. Injury in Fact

■ The Supreme Court has held that a cognizable injury can implicate aesthetic, recreational, or environmental, as well as economic, interests. *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). The magnitude of the harm is not relevant to the standing inquiry, and thus, the injury need not be large: an "identifiable trifle" is sufficient. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP )*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 no. 14, 37 L.Ed.2d 254 (1973). But plaintiffs must assert more than a generalized interest in environmental conservation. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). They must show some connection with the geographical area that is the subject of suit. *Sierra Club*, 405 U.S. at 734–35, 92 S.Ct. at 1365–66.

■ Plaintiffs submitted with their complaint affidavits by five of their members asserting aesthetic, recreational, and health interests in Makepeace Lake and bodies of water downstream therefrom, including Great Egg Harbor River, Great Egg Harbor, and Lake Lenape. These affiants state, *inter alia*, that they engage in recreational activities in and around these waters, including nature walking, bird watching, boating, swimming, and fishing. They state that these waters smell and appear polluted, and that they would recreate in these areas more often if the waters were not so polluted. Three affiants also state that they avoid eating fish caught in these waters because of concerns that those fish are contaminated with harmful pollutants. Finally, all state that they are interested in obtaining accurate information regarding the amount of pollution discharged into these waters so that they can make informed decisions as to what kind of recreational activities involving these waters are safe.

These assertions have not been contradicted by defendant and thus stand as undisputed facts. We find these assertions to be sufficient to satisfy the injury in fact prong of the standing inquiry. Indeed, the Third Circuit, as well as many judges of this court, have reached the same conclusion based on very similar kinds of injury. *See, e.g., PIRG v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 71 (3d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *PIRG v. Star Enterprise*, 771 F.Supp. 655, 662 (D.N.J.1991); *PIRG v. Rice*, 774 F.Supp. 317, 322 (D.N.J.1991); *SPIRG v. Jersey Central Power & Light Co.*, 642 F.Supp. 103, 106 (D.N.J.1986); *SPIRG v. AT & T Bell Laboratories*, 617 F.Supp. 1190, 1200 (D.N.J.1985).

## 2. Fairly Traceable

■ In *PIRG v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64 (3d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991), the Third Circuit discussed the application of the "fairly traceable" prong of the *Valley Forge* test to Clean Water Act cases such as this one. The court held that although plaintiffs must do more than simply show violations of defendants' permits in order to meet the fairly traceable requirement, they need not "show to a scientific certainty that defendant's effluent and defendant's effluent alone, caused the precise harm suffered by the plaintiffs." *Id.* at 70. Rather, a plaintiff can prevail on summary judgment simply by showing a "substantial likelihood" that the conduct of defendant caused plaintiff's injury.[6] *Id.* This may be done by showing that defendant has:

1) discharged some pollutant in concentrations greater than allowed by its permit

2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that

<hr>

**6.** In *United States v. Students Challenging Regulatory Agency Procedures, (SCRAP )*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Supreme Court made clear that the causation standard for purposes of standing analysis is not a strict one. Thus, the causal connection between the challenged action and plaintiff's injury may be quite indirect. In *SCRAP*, the Court held that

an environmental group had standing to challenge a railroad freight surcharge that the group asserted would prompt increased use of non-recyclable materials, and thereby result in a greater volume of refuse in certain areas in which their members had recreational interests. *See id.* at 683–90, 93 S.Ct. at 2413–17.

3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.

*Id.*

The first of these criteria is clearly met here. It is not disputed that defendant discharged pollutants in excess of the permit limits. Defendant contends that plaintiffs have failed to satisfy the second criterion, however. First, defendant argues that the discharge is not "into a waterway in which the plaintiffs have an interest" because the effluent is discharged into the wetlands area next to Makepeace Lake rather than into the lake itself. Defendant argues that these two bodies of water are distinct because there is no surface water connection between them. Second, defendant argues that effluent is "renovated" by vegetative uptake in the wetlands, such that any pollutants that do reach Makepeace Lake are no longer in concentrations in excess of the permit limits.

First, we note that the term "waterway" in *Powell Duffryn* has not been strictly construed in this district to refer only to a single lake or stream. Rather, where plaintiffs assert an interest in some body of water downstream from the waterway into which pollutants are discharged, the causation standard of *Powell Duffryn* is found to be met. *See PIRG v. Yates Indus., Inc.,* 757 F.Supp. 438, 443 (D.N.J.1991) ("it is enough to show that plaintiffs' members have suffered injuries through waters directly affected by any illegal discharges"); *PIRG v. Rice,* 774 F.Supp. 317, 323 (D.N.J.1991) (where defendant discharged into Crosswicks Creek, plaintiffs' interest in waters of Delaware River downstream from Creek sufficient to confer standing); *PIRG v. GAF,* No. 89–2283, slip op. at 23 (D.N.J. Nov. 20, 1990) ("the Clean Water Act [does not] require plaintiff to demonstrate that they use the exact tributary into which defendant discharges rather than the waters into which that tributary flows," rather, where defendant discharged into brook which flows through pond and empties into another brook which flows into Passaic River, plaintiff's interest in Passaic River sufficient to confer standing).

Defendant seeks to distinguish these cases on the ground that each involved the discharge of pollutants into waters which flowed over land into the bodies of water in which plaintiffs claimed an interest.[7] But we reject defendant's contention that the principle articulated in the above cases must be limited to situations in which water flows across the surface of the land. Plaintiff has submitted uncontradicted evidence that there is a groundwater connection between the wetlands and Makepeace Lake, such that groundwater from the wetlands flows into the lake.[8] Additionally, water quality reports conducted by the Department of Environmental Protection indicate that high levels of some of the pollutants contained in defendant's effluent have been found in the lake.[9] This evidence shows that there is a

---

**7.** On the present record, there is a factual dispute as to whether a surface water connection between the wetlands and the lake exists. Plaintiffs have pointed to inconsistencies in the affidavits and deposition testimony of defendant's expert, Gary Franklin, which indicate that he may in fact have observed a surface water connection at some time during the year. Additionally, they have submitted an affidavit from their own expert, Patrick O'Malley, stating that there is a surface water connection between the wetlands and the lake.

**8.** In addition to expressing his own opinion that such a groundwater connection exists, plaintiffs' expert, Patrick O'Malley, also pointed out that the affidavit submitted by one of defendant's experts, Timothy W. Johnson, in effect admitted that some hydrological connection, either through surface water or groundwater, must exist. Mr. Johnson stated that the effluent from the Farley Service Plaza served to counteract the loss of water in the wetlands which was caused by the artificial lowering of the water level in Makepeace Lake. Mr. O'Malley pointed out that this statement necessarily assumes the existence of some hydrological connection because the lowering of the lake would not have caused a loss of water in the wetlands absent such a connection.

**9.** These reports concluded that lead was present in the muscle tissue in fish from the lake "in concentrations significantly higher than those typically encountered in fish from other areas in New Jersey," *Plaintiffs' exhibit 40; Defendant's exhibit Z;* and that "the [Atlantic City] Expressway [sewage treatment plant] effluent from the Frank S. Farley Rest Area was adding phosphorous to the lake causing part of the lake to exceed the state standard to prevent nuisance aquatic plant growth." *Plaintiffs' exhibit 41; Defendant's exhibit Z.* Although these reports are

substantial likelihood that pollutants from defendant's discharge reached the lake and is therefore sufficient to meet the *Powell Duffryn* causation standard.

■ The second aspect of defendant's argument—that plaintiffs do not have standing because any pollutants that did reach the lake from the wetlands were no longer in concentrations in excess of the permit—is little more than a red herring. As we noted above, there is no quantitative test for injury in fact. *See SCRAP,* 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14. A defendant cannot escape a finding that plaintiff's injuries are fairly traceable to its conduct by arguing that the degree to which the waterway is polluted by their discharge is so small that plaintiffs are not injured thereby. *See SPIRG v. Georgia–Pacific Corp.,* 615 F.Supp. 1419, 1424 (D.N.J.1985). Obviously, in the *GAF* and *Yates* cases, by the time they reached the downstream waterways in which plaintiffs asserted an interest, the pollutants discharged had been diluted to significantly lower concentrations than existed in the original effluent. Indeed, in any Clean Water Act case, the concentration of pollutants when measured in the waterway into which they are discharged will be significantly lower than in the effluent itself.

■ Defendant fundamentally misconstrues the rationale behind the structure of the Clean Water Act by this argument. The permit limits under the Act are intended to measure the effluent itself before it enters the water, not water quality. Thus, the con-

centrations allowed under the permits are much higher than what would be safe for the body of water as a whole.

[The Clean Water Act] was enacted in 1972 after "[e]nforcement of predecessor statutes, which had relied on water quality standards as the primary method of pollution control, had been largely unsuccessful. It was too difficult to establish the necessary correlation between effluent discharges by particular sources and the quality of the body of water into which the effluent flowed. To solve the dilemma the Act, while retaining water quality standards, predicated pollution control on the application of control technology on the plants themselves rather than on the measurement of water quality."

*SPIRG v. Tenneco Polymers, Inc.,* 602 F.Supp. 1394, 1397 (D.N.J.1985) (quoting *Hooker Chems. & Plastics Corp. v. Train,* 537 F.2d 620, 623 (2d Cir.1976)).

Additionally, we find that plaintiffs have successfully met the third prong of the *Powell Duffryn* "fairly traceable" test, by showing that the pollutants discharged by defendant in excess of its permit limits cause or contribute to the types of injuries alleged by plaintiffs.[10] For example, the record shows that defendant has exceeded its permit limitations for copper, lead and zinc a total of 246 times. All three of these heavy metals are recognized as toxic pollutants by the EPA, *see* 40 C.F.R. 401.15 (1992), which means that they are harmful to fish, other wildlife, and human beings. Toxic pollutants are defined in the Act as:

---

based on studies conducted in 1983 and 1984, prior to the effective date of the permit at issue in this case, there is no reason to think that the levels of pollutants discharged by defendant during this time was any different than during the period when the permit was in force (1986 through 1991), since no alterations were made in the sewage treatment plant during that time.

We also note that defendant's expert, Gary Franklin, testified in his deposition that the "renovation" processes in the wetlands did not remove all of the pollutants from defendant's effluent. *See Plaintiffs' exhibit 32,* at 80–83, 97.

10. An affidavit by defendant's expert, Timothy Johnson, states that, in his opinion, the apparently polluted conditions attested to by plaintiffs' members in their affidavits "were not caused or

contributed by effluent permit characteristics discharged from the Farley Wastewater Treatment [Plant]." *Defendant's exhibit AA.* We do not find that this statement defeats plaintiffs' motion for summary judgment as to standing, however. Under the *Powell Duffryn* standard, plaintiffs need not prove that defendant's effluent actually caused their harm, only that the pollutants discharged are of a type that causes or contributes to the types of injuries asserted. *See Powell Duffryn,* 913 F.2d at 70. Thus, in *Powell Duffryn,* the Third Circuit found very similar statements by experts insufficient to defeat plaintiffs' standing on summary judgment. *See id.* at 71–72 (expert stated his opinion that the poor water conditions complained of by the plaintiffs did 'not originate from [defendant] nor are they related to [defendant's] discharges'"); *see also Georgia–Pacific,* 615 F.Supp. at 1423–24.

those pollutants ... which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly through food chains, will ... cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions ... or physical deformations, in such organisms or their offspring.

33 U.S.C. § 1362(13). Indeed, "the EPA has found that there is no safe threshold for human exposure to lead." *Arkansas Wildlife Federation v. Bekaert Corp.*, 791 F.Supp. 769, 777 (W.D.Ark.1992) (citing 56 Fed.Reg. 26, 460, 26,467–26,471 (1991)) (where harm alleged by plaintiffs included concerns over pollutants in fish caught in river, lead caused or contributed to type of harm alleged). Additionally, plaintiffs have submitted a manual issued by the EPA entitled "Quality Criteria for Water," according to which phosphorous is associated with the process of eutrophication in lakes. Defendant discharged phosphorous in excess of its permit limits on 96 occasions.[11]

### 3. Redressability

Finally, the third prong of the *Valley Forge* test for standing asks whether plaintiffs' injury is likely to be redressed by a favorable decision. Defendant makes no argument with respect to this prong, and we find that it is also satisfied here. Courts have repeatedly held in cases such as this that the imposition of civil penalties against permit violators is likely to redress plaintiffs' injuries by providing a deterrent against further violations by the particular defendant as well as other permit holders. *See Powell Duffryn*, 913 F.2d at 73; *PIRG v. Star*, 771 F.Supp. at 664; *SPIRG v. AT & T*, 617 F.Supp. at 1200–01.

Thus, having found all three prongs of the *Valley Forge* test to be satisfied here, we hold that plaintiffs' members do meet the requirements for individual standing; and therefore, we reject defendant's argument

that plaintiffs do not have standing to sue as an organization.[12]

### C. *Citizen Suit Preclusion*

Defendant argues that plaintiffs should not be able to prosecute this action with respect to those violations that were already the subject of enforcement action by New Jersey Department of Environmental Protection. The Department specifically considered these same violations and decided not to impose administrative penalties, but rather to enter into an agreement—the Memorandum of Understanding ("MOU")—requiring defendants to take "extreme" corrective action. To allow plaintiffs to come into federal court years later and have penalties imposed, defendant argues, would undercut the decision already made by the Department as to how best to enforce the Act. Defendant relies on the Supreme Court's opinion in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), in which it said:

Permitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit. This danger is best illustrated by an example. Suppose that the Administrator [of EPA] identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as install expensive machinery, that it otherwise would not be obligated to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.

484 U.S. at 60–61, 108 S.Ct. at 383.

Plaintiffs acknowledge that under certain circumstances, where prior enforcement ac-

---

**11.** Plaintiffs' members state that Makepeace Lake appears stagnant and polluted, and that Lake Lenape appears and smells polluted.

**12.** Defendant does not dispute that the other two requirements for organizational standing are met here: that "the interests it seeks to protect are

germane to the organization's purpose," and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441.

tion has been taken by the state, citizen suits are precluded. In fact, the Act specifically provides for such preclusion at § 505(b) and § 309(g). Section 505(b)(1)(B) provides that a citizen's suit cannot be brought if "[a] State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State" against the violator. 33 U.S.C. § 1365(b)(1)(B). Section 309(g)(6)(A) provides that a citizen's suit cannot be brought regarding violations

> with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or for which ... the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under ... such comparable State law.

33 U.S.C. § 1319(g)(6)(A).

■ Plaintiffs persuasively argue that the passage from the *Gwaltney* opinion relied on by defendant merely refers to these provisions in the statute and uses them to illustrate a point about why the Act was not meant to allow citizen suits for wholly past violations. The Court gave no indication that it meant to expand the scope of these provisions, and the provisions themselves are clearly inapplicable here. Section 505(b) is inapplicable because the Department never commenced an action in court against defendant. Section 309(g) is also inapplicable because no state administrative enforcement action was ever formally commenced;[13] the state law which the Department was enforcing through the MOU is not "comparable to" § 309 of the federal Act;[14] and no penalties were assessed.

Accordingly, we hold that this citizen suit is not precluded by the Department's prior enforcement action with respect to these violations.

## D. Liability

■ Having found that the case is not moot, that plaintiffs have standing, and that the suit is not precluded by prior government enforcement action, we finally reach the issue of liability. Under the Clean Water Act, a violation of a NPDES permit, including the monitoring and reporting requirements, constitutes a violation of the Act itself. *See* 33 U.S.C. §§ 1311, 1318, 1319, 1365; *PIRG v. Rice,* 774 F.Supp. 317, 325 (D.N.J.1991); *SPIRG v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1090 (D.N.J.1986), *aff'd in part and rev'd in part,* 913 F.2d 64 (3d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *SPIRG v. AT & T Bell Labs,* 617 F.Supp. 1190, 1203 (D.N.J.1985).

■ Defendant does not dispute plaintiffs' assertions as to the number of instances in which their actions violated the terms of the original permit. Rather, defendant argues that the original permit was not in effect after the signing of the MOU by defendant and the Department, because the MOU had the effect of legally modifying the permit. Accordingly, defendant argues, compliance with the Act with respect to post-MOU discharges must be measured with reference to the relaxed effluent limitations and reporting and monitoring requirements contained in the MOU, not the permit.

Plaintiffs, however, point to the following clause in the MOU itself, which explicitly refutes defendant's argument:

> All provisions of the permit shall remain in full force and effect and are not modified by this MOU.... The enforcement com-

---

**13.** State regulations prescribe specific procedures for the institution of an enforcement proceeding under the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A–1 *et seq.,* including service of notice by certified mail or personal service which notifies the violator of the charges against her, the amount of penalty to be imposed, and advises of the right to a hearing. *See* N.J.A.C. 7:14–8.3(a). The Department instead began its "proceeding" against defendant by sending the proposed MOU along with a cover letter, which neither specified the amount of penalty to be imposed nor advised of the right to

a hearing. Therefore, no state administrative action was ever commenced within the meaning of § 309(g).

**14.** While the federal law requires notice to the public of enforcement actions along with the opportunity to comment on any proposed order and to participate in a hearing, *see* 33 U.S.C. § 1319(g)(4)(A) & (B), no such provisions for public involvement exist in the state statute or regulations.

pliance requirements of this MOU do not modify any provisions of the permit or any of the duties or liabilities of NJEA thereunder.

*Defendant's exhibit B, ¶ 15.*

Additionally, plaintiffs argue, even if the MOU itself were worded differently, it could not legally have constituted a modification of the permit under New Jersey law. State regulations set forth very specific procedures that the Department must follow in order to modify a permit, including issuing a new draft permit for public comment prior to a final decision to modify. *See* N.J.A.C. 7:14A–7.5(b)1, 7.6. These procedures were not followed here.

Finally, the Act itself contains an "anti-backsliding" provision, which states that "a permit may not be renewed, reissued, or modified ... to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit." 33 U.S.C. § 1342(*o*). Since the MOU's effluent limitations were less stringent than those in the permit, it cannot constitute an actual modification under this provision.

For all of these reasons, we reject defendant's contention that the MOU constituted a legal modification of the NPDES permit. Accordingly, we hold that defendant's compliance with the Act must be measured according to the permit itself.

■ Defendant does not dispute that the DMRs and laboratory reports submitted by plaintiffs show that defendant committed 2,435 violations of the discharge limits, 1,870 violations of the monitoring requirements, and 632 violations of the reporting requirements of defendant's permit from 1986 through 1991. It is well-established that such documents may be relied on by courts in granting summary judgment as to liability in Clean Water Act cases. *See, e.g., United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (defendant's report of an oil spill as required under Clean Water Act could be used to establish liability for civil penalties under Act); *PIRG v. Rice,* 774 F.Supp. 317, 325 (D.N.J.1991) (DMRs, laboratory reports, and supplemental operating logs showing violations of NPDES permit used to establish liability under Clean Water Act); *PIRG v. GAF,* No. 89–2283, transcript at 26–27 (D.N.J., Nov. 20, 1990) (DMRs); *SPIRG v. Jersey Central Power and Light Co.,* 642 F.Supp. 103 (D.N.J.1986) (DMRs and Non-compliance Reports); *SPIRG v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1090 (D.N.J.1986), *aff'd in part and rev'd in part,* 913 F.2d 64 (3d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *SPIRG v. Georgia–Pacific Corp.,* 615 F.Supp. 1419, 1429 (D.N.J. 1985) (DMRs).

Accordingly, since the undisputed facts show that the violations of the Clean Water Act alleged by plaintiff did occur, we will grant summary judgment to plaintiffs as to liability.