**ALTAMAHA RIVERKEEPERS,**
Plaintiff,

v.

**CITY OF COCHRAN, a municipal corporation, Defendant.**

No. 500CV4472(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Sept. 11, 2001.

Donal D. J. Stack, Atlanta, GA, for Plaintiff.

Thomas F. Richardson, Macon, GA, for Defendant.

## ORDER

OWENS, District Judge.

Before the Court is Plaintiff's Motion for Partial Summary Judgment. Plaintiff has brought a citizen suit under § 505 of the Federal Water Pollution Control Act, Amendments of 1972 ("Clean Water Act"), 33 U.S.C. § 1365(a)(1) (1986 & Supp.2001).

# I. FACTUAL AND PROCEDURAL BACKGROUND

In 1972, Congress enacted the Clean Water Act to protect the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Clean Water Act prohibits the discharge of any pollutant into "waters of the United States" except in accordance with standards promulgated and permits issued under the Act. *Id.* §§ 1311(a), (b)(1)(C). All "point sources" must obtain and operate under a National Pollutant Discharge Elimination System ("NPDES") permit, which contains effluent standards that limit the amount of discharges of particular pollutants.[1] *Id.* § 1342. Pursuant to § 402 of the Act, the Environmental Protection Agency ("EPA") has delegated the authority to issue and enforce NDPES permits in Georgia to the Georgia Department of Natural Resources, Environmental Protection Division ("EPD").

The City of Cochran, Georgia ("the City") operates a wastewater treatment facility, for which the City obtained an NPDES permit from the EPD. The City's facility discharges treated wastewater into Jordan Creek, a tributary of the Ocmulgee River in the Altamaha River basin. From July 1995 to August 2000, the City regularly exceeded the effluent limitations in its NPDES permit.

On September 25, 2000, Altamaha Riverkeeper ("ARK"), a non-profit environmental organization founded to protect and restore the habitat, water quality, and flow of the Altamaha River, filed suit against the City. ARK alleged multiple violations of the City's NPDES permit, based on the Discharge Monitoring Reports ("DMRs") submitted to the EPD by the City. ARK members claimed theses violations pollut-

---

1. A point source is "any discernible, confined and discrete conveyance ... from which pol-

lutants are or may be discharged." 33 U.S.C. § 1362(14).

ed the river, causing a decrease in the fish population and lessening the members' enjoyment and use of both Jordan Creek and the Ocmulgee River. ARK sought declaratory and injunctive relief as well as civil penalties and attorney fees.

On December 26, 2000, ARK moved for partial summary judgment. The City responded, and thereafter two telephone conferences were conducted with the District Court. In the first, it was determined that the EPD's participation was necessary to ensure relief that would not subject the City to multiple or inconsistent obligations. In the second, a representative of the Attorney General's office suggested that the parties reach an agreement without joining the EPD. The EPD would then approve or disapprove the proposed remedies. Negotiations between the parties deteriorated, however, so ARK renewed its Motion for Partial Summary Judgment on June 22, 2001. The EPD was then joined as a party on August 30, 2001.

## II. FINDINGS OF FACT

The following material facts are undisputed:

—The City discharges treated wastewater into Jordan Creek, a tributary of the Ocmulgee River in the Altamaha River basin, pursuant to its NPDES permit issued by the EPD.

—The City was in violation of its NPDES permit for the months of July 1995 to November 1996; January 1997 to April 1998; July 1998 to November 1998; January 1999 to March 1999; and May 1999 to April 2001.[2]

—On July 14, 2000, ARK gave notice of its intent to sue to the EPA Administrator, the EPD, and the City.[3]

—The EPD did not respond at that time.

—ARK filed its Complaint on September 26, 2000.

—The City has designated funds and developed plans to upgrade the City's wastewater treatment facility, but it awaits final approval by the EPD. (Killebrew Affidavit, ¶¶ B–D, O).

—The EPD has placed the City under a proposed Consent Order and fined the City $5,000 for its violations. (*Id.* ¶ N).

## III. DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material facts and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "To survive a motion for summary judgment, the non-movant must present evidence that there is a dispute about a genuine issue of material fact." *Trucks, Inc. v. U.S.*, 234 F.3d 1340, 1342 (11th Cir.2000).

---

**2.** In response to ARK's original Statement of Undisputed Facts, the City denied it violated its NPDES permit limitations, but it offered no evidence to controvert the DMRs it submitted to the EPD, which show discharges violating the applicable effluent limitations. Moreover, the City conceded in its Response in Opposition to Plaintiff's Motion for Partial Summary Judgment that it was in violation "[d]uring some of the months since November 1997 to August 2000." (p. 2). Additionally, in the telephone conference of February 15, 2001, the City admitted its permit viola-

tions. In its Reply and its Renewed Motion for Partial Summary Judgment, ARK presented DMRs showing violations for September 2000 to April 2001. The City made no response to ARK's Renewed Motion for Partial Summary Judgment, so those alleged violations are deemed admitted. *See* Local Rule 56.

**3.** The letters were dated July 12, 2000, but delivered on July 14, 2000, according to certified mail receipts.

The City contends partial summary judgment for ARK is not warranted for two reasons. First, the City argues that ARK lacks Article III standing to bring this suit. Second, the City claims the citizen suit is barred because the EPD is now actively enforcing the City's NPDES permit and such enforcement renders this suit "duplicative" and "intrusive."

### A. Standing

■ "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). Individual members have standing if they can show that (1) they have suffered an injury in fact; (2) the injury is fairly traceable to the defendant; and (3) a favorable decision is likely to redress the injury. *See id.* at 180–81, 120 S.Ct. 693 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

While the City makes no contentions that the case at bar is not related to ARK's purpose or that individual members are required to participate, the City does contend that ARK's individual members do not have standing. The City argues: (1) ARK's members cannot satisfy the "injury in fact" prong of the standing doctrine; (2) the alleged injuries are not directly traceable to the City's wastewater facility; and (3) the relief sought would not guarantee more fish in the creek or river.

■ First, an "injury in fact" is one "that is (a) concrete and particularized and

(b) actual or imminent, not conjectural or hypothetical." *Id.* at 181, 120 S.Ct. 693. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183, 120 S.Ct. 693 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). In *Laidlaw Environmental Servs.*, plaintiffs averred in their affidavits and depositions that they thought the river smelled and looked polluted and that they used the river less often for recreational, aesthetic, and commercial purposes because of Laidlaw's discharges. 528 U.S. at 181–83, 120 S.Ct. 693. The Supreme Court held these statements were not too generalized, speculative, or improbable to support standing. *Id.* at 184, 120 S.Ct. 693.

ARK put forth the following evidence: ARK member Bruce Berryhill declared in his affidavit that he has used Jordan Creek and the Ocmulgee River for at least thirty years. (Berryhill Affidavit, ¶ 4 (February 15, 2001)). He has fished and boated on Jordan Creek, downstream of the treatment plant, where he has seen algae and foam, detected an odor, and noticed the water looked black. (*Id.* ¶¶ 9, 11). He uses Jordan Creek less frequently now because of the pollution, and he no longer fishes or swims there. (*Id.* ¶ 9). He has noticed there are fewer fish in the Ocmulgee River, so he does not eat them as often. (*Id.* ¶¶ 10, 11). He also will not let his children swim in the Ocmulgee River as often as they used to because he is afraid they will be harmed by pollution. (*Id.* ¶ 13).

ARK member Michael Nobles stated in his affidavit that he has used the Ocmulgee River for about forty years and Jordan Creek for about twenty years. (Nobles Affidavit, ¶ 3 (February 23, 2001)). He

said that, downstream of the City's wastewater facility, Jordan Creek "is nasty looking." (*Id.* ¶ 4). He no longer wants to swim in the Ocmulgee River because of the City's discharges. (*Id.* ¶ 4). He is also concerned that it is not safe to eat the fish and that there are fewer fish than there used to be. (*Id.*). He uses the river less now than he would if it were not polluted. (*Id.*).

ARK member Wyndell Berryhill averred in his affidavit that he has used and enjoyed Jordan Creek and the Ocmulgee River for sixty-two years. (Berryhill Affidavit, ¶ 4 (February 23, 2001)). He has seen algae and fungus in Jordan Creek, downstream of the City's wastewater facility. (*Id.* ¶ 5). He no longer swims in Jordan Creek because it is polluted. (*Id.* ¶ 6). He no longer fishes on Jordan Creek because the water is so "nasty" that there are few fish. (*Id.* ¶ 7). He sometimes fishes on the Ocmulgee River, but he will not eat the catfish he catches there because of the pollution. (*Id.* ¶ 8). He has seen sores on many of the fish he has caught. (*Id.*).

These affiants, then, all use Jordan Creek and the Ocmulgee River. They have attested to specific decreases in their recreational use and aesthetic enjoyment of these waters as a result of the wastewater facility's discharges. Therefore, the Court finds they have sufficiently alleged an injury in fact.

Next, the City claims the pollution evident in Jordan Creek and the Ocmulgee River is not "directly" traceable to its facility. The City instead blames the pollution on Lithonia Lighting, another NPDES permittee. However, the City's own DMRs indicate violations of its NPDES permit. Additionally, all affiants stated

the foam, algae, odor, and decreased fish populations were evident downstream of the City's discharge point. Furthermore, even if Lithonia Lighting were partially responsible for the pollution, this fact would not destroy all causal link to the City's discharges. *See Student Public Interest Research Group v. Tenneco Polymers, Inc.,* 602 F.Supp. 1394, 1397 (D.N.J. 1985) (holding that pollution may derive from multiple sources and that it is not necessary to pinpoint which polluter has caused a specific harm).

■ Because the correct standard for determining standing is an injury "*fairly* traceable to the challenged action of the defendant," *See Laidlaw Environmental Servs.,* 528 U.S. at 180, 120 S.Ct. 693 (emphasis added), the Court finds the evidence presented to be sufficient to establish a causal link between the City's discharges and the alleged injuries.

■ As for redressability, the City mistakenly focuses on the injury to the environment rather than the injury to ARK and its members. *See id.* at 181, 120 S.Ct. 693 ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff.") It is therefore not necessary that the Court's remedy replenish the fish population; it is only necessary that the remedy bring the City into compliance with its NPDES permit so that ARK members and others may use and enjoy the waterways at issue without fear of pollution.

Accordingly, the Court finds ARK has alleged an injury in fact fairly traceable to the City's wastewater facility that would be redressed by the relief sought. Because the individual members of ARK would have Article III standing, ARK also has standing to sue.[4]

---

4. The City earlier contended ARK lacked standing because there was no evidence of any violation at the time ARK brought suit. However, in its Reply and its Renewed Mo-

tion for Summary Judgment, ARK provided DMRs for September 2000 to December 2000

## B. EPD's Involvement

Under the Clean Water Act, citizens may bring suits against NPDES permit violators so long as neither the EPA nor the EPD is already "diligently prosecuting" the action. *Id.* § 1365(b)(1)(B). Before bringing suit, however, citizens must give sixty days' notice of their intent to sue to the EPA, the EPD, and the permitee. *Id.* § 1365(b)(1)(A). If no action is taken by the EPA or the EPD before the suit is filed, then the citizen suit may proceed. *Id.* § 1319(g)(6)(B)(i). Even if the EPA or the EPD does take action after receiving notice but before the suit is filed, the suit may proceed if it is filed after the sixty day notice but within 120 days of the date notice was given. *Id.* § 1319(g)(6)(B)(ii).

 Here, ARK gave notice to the EPA, the EPD, and the City around July 12, 2000. The EPD did not act until after the suit was filed, at which time the EPD began working with the City to upgrade its water treatment facility. Even had the EPD begun its "prosecution" before the suit was filed, ARK filed its Complaint on September 26, 2000, more than sixty days after the notice but well within 120 days. Therefore, although the EPD has now proposed a Consent Order and fined the City for noncompliance with its NPDES permit, those actions do not bar this citizen suit.[5]

## IV. CONCLUSION

 Violation of NPDES permit limitations is a strict liability offense. *See* 33 U.S.C. § 1311(a) (1986) ("Except as in compliance with this section and [other sections of the Act], the discharge of any

pollutant by any person shall be unlawful."); *Laidlaw Environmental Servs.*, 528 U.S. at 174, 120 S.Ct. 693 (citing 33 U.S.C. § 1342(h)) ("Noncompliance with a permit constitutes a violation of the Act."); *Kelly v. U.S. E.P.A.*, 203 F.3d 519, 522 (2000) ("Civil liability under the Clean Water Act is strict."); *Public Interest Research Group v. New Jersey Expressway Authority*, 822 F.Supp. 174, 184 (D.N.J.1992) (citing 33 U.S.C. §§ 1311, 1318, 1319, 1365) ("Under the Clean Water Act, a violation of a NPDES permit ... constitutes a violation of the Act itself.").

ARK has presented evidence of 97 NPDES permit violations by the City occurring from July 1995 to April 2001. Many of these violations were monthly violations, which could be multiplied by the number of days in the month, bringing the total number of violations to well over 600. While the City has taken steps to implement a new wastewater facility to prevent future violations, that action does not relieve the City from liability for the violations at issue.

Accordingly, the Court hereby GRANTS ARK's Motion for Partial Summary Judgment with regard to the City's liability. The Court will need to make determinations, however, concerning the amount of penalties to be assessed for the violations, the appropriateness of injunctive relief, and ARK's entitlement to attorney fees, if any. These matters will be addressed at a hearing to be scheduled by the Court.

---

that showed continuing NPDES permit exceedences.

5. The Court notes the EPD has fined the City a total of only $5,000 for its continuing violations for which the EPA could impose a $10,000 to $25,000 per day penalty. *See* 33 U.S.C. § 1319(g)(2)(A). Such leniency hardly

qualifies as "diligent prosecution." *See Jones v. City of Lakeland*, 224 F.3d 518, 522–23 (6th Cir.2000) (holding imposition of "nominal token penalties in lieu of punitive compliance incentive penalties of $10,000.00 per day authorized by the Clean Water Act ... contradicted a level of 'diligent prosecution' ").